UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHIRLEY COE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:04-cv-0836-JDT-WTL |
| ) | |
| CRYOVAC, INC. d/b/a SEALED AIR ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**Entry on Defendant's Motion for Summary Judgment (Docket No. 23)**[1]

This cause comes before the court on the Defendant's motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Though the time for filing a response has passed, the Plaintiff has not responded to the motion. Therefore, the motion is ripe for summary ruling pursuant to Local Rule 7.1(a). The court will presume that the Plaintiff did not respond because she had nothing to offer that would rebut the assertions of the defense.

**I. Background**

Plaintiff Shirley Coe claims that Defendant Cryovac, Inc. d/b/a Sealed Air Corporation ("Cryovac") disciplined and ultimately terminated her employment on October 28, 2003, because of her race, age, and sex, and in retaliation for complaining about alleged unlawful discrimination. She also claims that she was harassed because

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

of her race, age, and gender, and that she was denied proper wages because of her race and sex.  Ms. Coe brings her claims under Title VII, Section 1981, and the Age Discrimination in Employment Act ("ADEA").

Cryovac seeks summary judgment on all claims.  It contends that Ms. Coe was disciplined, suspended, and terminated for sustained poor work performance, and her wage rate progression was delayed because of her poor work performance as well.  Cryovac further contends that her supervisors' criticisms of her work performance did not create a hostile work environment.  It denies that it disciplined, suspended, or terminated Ms. Coe in retaliation for complaining about alleged unlawful discrimination.

## II.  Material Facts Supporting Summary Judgment

These facts are taken from the Defendant's summary judgment submission.  The Plaintiff's failure to respond to that submission, in combination with the effect of Rule 56(e) of the Federal Rules of Civil Procedure and Local Rule 56.1(e) of this court, allows the court to take these facts as the Defendant submitted them.  These facts are supported by the materials cited in the Defendant's brief and are uncontested.

Cryovac manufactures polystyrene foam trays used in food packaging.  Shirley Coe is a former employee of Cryovac.  Cryovac terminated her employment on October 28, 2003.

Cryovac typically follows a progressive disciplinary procedure when confronted with poor job performance by an employee.  The first phase is a verbal counseling or

"Record of Counseling" that is discussed with the employee and documented on a "Record of Counseling" form. The disciplinary procedure then employs four subsequent steps: 1st Offense – Written Warning; 2nd Offense – Second Written Warning (Final Written Warning); 3rd Offense – Subject to Suspension without Pay; and 4th Offense – Subject to Termination. Cryovac documents each disciplinary infraction on a Disciplinary Action Report ("DAR"). The DAR contains boxes where Cryovac may check off the appropriate progressive discipline step.

Cryovac's production wage rates are based on a matrix that is established by the company on a yearly basis. Cryovac sets pay rates for each of its job positions. Ms. Coe does not know the specific wages of other Extrusion Operators. An employee's wage rate is determined by the period of time that the employee is in a particular job, with a progressive increase over a period of time depending upon acceptable performance, up to a maximum level. An employee's wage rate progression may be delayed if the employee's poor performance warrants. When an employee first bids into a position, he or she is paid the entry rate. For Extrusion Operators, the pay rate could change after a three-month probationary period in the position, seven-months in the position, and fourteen-months in the position.

Beginning in 1997, Ms. Coe worked as a Thermoforming Operator. She received two verbal written warnings for poor job performance while working as a Thermoforming Operator, including one on May 30, 2001, when her supervisor verbally warned her about not following procedure during a color change.

3

Ms. Coe bid on the Extrusion Operator, B-Shift, position in November 2001, and was selected for the position. Her starting wage rate as an Extrusion Operator was $15.34, the entry level rate for the position. The 2002 wage rate went into effect on December 7, 2001, at which time Ms. Coe's wage rate increased to $15.81 an hour, the entry level rate for 2002.

As an Extrusion Operator, Ms. Coe was responsible for operating the extruder machine. She was responsible for setting the machine to produce rolls of polystyrene to the in plant specifications, including adding the right color concentrate and blending the raw materials appropriately. She also was responsible for monitoring the size of rolls of polystyrene produced by the extruder and removing the rolls from the machine when they were fully wound. Her other responsibilities were performing quality checks and completing all production paperwork.

Typically, Extrusion Operators know by the second roll-set of the same material produced how long it takes for the roll to be completed and how to time the roll changes. They also are aware of the raw materials and color needed to produce the desired product and to run the machine. If Extrusion Operators are late in removing a roll from the machine or let the machine run out of color or raw materials, the polystyrene foam produced may be scrap. Scrap is wasteful: it wastes the operators', shift technicians', and supervisors' time, slows down the overall production operation, and reduces Cryovac's profitability. When Extrusion Operators make a mistake or in an emergency situation, any person on the manufacturing floor can stop the extruder machine. When the machine is stopped, the equipment shuts down and it takes a significant amount of

time to get the system up and running again.  Any errors in running the extruder machine may result in discipline for the Extrusion Operators.

Ms. Coe received her first employee performance review as an Extrusion Operator on March 15, 2002.  The review stated that she met all expectations of the job.  With the performance review, Ms. Coe's wage rate increased to $16.04 an hour, the designated three-month wage rate for Extrusion Operators, assuming adequate work performance.

On July 31, 2002, Ms. Coe received a written DAR for poor job performance.  This was step two of the progressive discipline plan as she had received a verbal counseling in May 2001 for poor job performance.  Ms. Coe received the written warning because she let the bottom roll of material get too big for the winder, requiring the machine to be stopped.  Ms. Coe lost continuous use of the line while the machine was off.  Her supervisor, Bill Rohl, spoke with her about this incident and discussed the written warning with her on July 31, 2002.

Because Ms. Coe's job performance did not improve, she was placed on an Action Plan on September 13, 2002.  She fell short in the areas of safety, teamwork, quantity, job knowledge, initiative, and dependability, and Cryovac expected improvement in these areas by December 1, 2002.  Because of Ms. Coe's poor performance, Cryovac delayed her wage rate increase to the 7-month wage for Extrusion Operators until her next performance review in December.

Ms. Coe received another DAR for poor job performance on September 27, 2002. Following the progressive discipline policy, the September 27 DAR was Ms. Coe's second written warning. Ms. Coe received the DAR because she was not watching the line on her machine and let the color blender run out of color. Rohl counseled her on paying more attention to her line and being more aware of the machine operations, as color blending is a standard operating condition ("SOC").

Ms. Coe received another performance review dated December 1, 2002. Pursuant to that review, her performance failed to meet Cryovac's expectations. Ms. Coe did not receive a wage increase to the seven-month level for Extrusion Operators with her December 1 performance review. Her wage increase was postponed for a second time, until March 1, 2003, once again because of her poor performance.

Ms. Coe's supervisor and the production manager prepared a second Action Plan for her on January 7, 2003. This Action Plan was a final written warning. Pursuant to the Action Plan, Ms. Coe was to improve in the areas of troubleshooting, machine knowledge, and speed. Ms. Coe was told that failure to improve by her next review would subject her to possible suspension, the next stage of discipline pursuant to the progressive discipline policy.

Ms. Coe received a third Action Plan in June 2003, as part of her performance review. Even though she did not improve her performance, she received a pay raise to the second level for Extrusion Operators, the seven-month wage rate, on June 9, 2003, that was retroactive to March 1, 2003. Pursuant to the Action Plan, if Ms. Coe failed to

improve and sustain her performance, she would be suspended. Cryovac expected her to increase her speed and initiative and eliminate performance issues that included conducting untimely SOC checks, delaying completion of her paperwork, and executing machine changes slowly, among others.

On June 24, 2003, Ms. Coe let her color blender run out while running one of the extrusion machines. She was repeatedly warned about this performance deficiency in prior disciplinary warnings and action plans but continued making the mistake. On July 7, 2003, despite repeated counseling, Ms. Coe again let her color blender run out while running one of the extrusion machines. On August 2, 2003, while Ms. Coe measured one of the material rolls on her machine, she hit the stop button and shut down her line. Because of her performance deficiencies from June 24, 2003 through August 2, 2003, scrap, as opposed to usable product, was generated. Ms. Coe received a third DAR on August 10, 2003, and was suspended from her position for three days without pay for repeated poor job performance, including three performance errors in two-months. Ms. Coe returned to work at the conclusion of the suspension.

In October 2003, the plant manager and production manager discussed with Ms. Coe her continuing performance problems and inquired if there was anything they could do to help her alleviate the problems. Ms. Coe's response was that she felt she had been trained appropriately but she thought the company was "being nitpicky." During the meeting in October 2003, Ms. Coe did not complain that she felt her treatment by her supervisors and discipline was discriminatory.

Ms. Coe's performance problems continued into October 2003. On October 13, she did not complete her paperwork. On the 14th and 15th, she let her rolls get too big. As a result of her inaction, she wasted raw materials and put her co-workers at unnecessary risk of injury or accident. On October 21, Ms. Coe's performance deficiencies resulted in a co-worker injury. Because Ms. Coe failed to change the roll on time, the material stopped winding into a roll. A co-worker was injured when the rollers started winding while she helped Ms. Coe take the oversized roll off the machine. As a result of this incident, Ms. Coe received her final disciplinary action report and was suspended immediately. In light of her four performance deficiencies within one week, her prior repeated warnings for poor performance, and several unsuccessful action plans to improve her performance, Cryovac terminated Ms. Coe's employment, effective October 28, 2003. Ms. Coe's termination was in accordance with Cryovac's progressive discipline plan.

### III.  Conclusions of Law

#### A.  Summary Judgment Standard

The federal summary judgment standard requires no discussion as it has been fully analyzed, especially since the Supreme Court directed clarity in the understanding of this concept in 1986. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law." The absence of opposition to the factual presentation of the Defendant essentially dooms the Plaintiff's suit. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Discrimination Based on Sex, Race and Age

There is no indication that Ms. Coe intended to produce direct evidence of discrimination, so she is left with the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to avoid summary judgment. This method of proof has been analyzed by courts through the years such that it has become almost rote, and no further elaboration of this method is necessary here. Only if the plaintiff makes a prima facie case does the burden of production shifts to the defendant-employer to identify some legitimate, non-discriminatory reason for the employment action. *Id.* at 802. If the employer meets this burden of production, the plaintiff must show that the reason is a mere pretext. *Id.* at 804. The ultimate burden of proof of intentional discrimination remains at all time with the plaintiff. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998).[2]

The Plaintiff's burden on a prima facie case is not great. She need only show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations (3) she suffered an adverse employment action;

---

[2] The standard for liability in an age discrimination case under the ADEA is identical to the standard for liability in a Title VII discrimination case. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2002). The same standards governing liability under Title VII for race discrimination apply to intentional race discrimination claims under § 1981. *Gonzalez*, 133 F.3d at 1032.

and (4) she was treated less favorably than similarly-situated employees outside the protected class. *See McDonnell Douglas*, 411 U.S. at 802. The Plaintiff fails to make even a prima facie showing on her claims of sex, race, or age discrimination. Certainly, she is a member of a protected class---she is female, African American, and over age forty. She also can show that she suffered adverse employment actions: suspension and ultimately termination. But Ms. Coe fails with respect to the other elements of proof: 1) she has not shown that she was meeting her employer's legitimate performance expectations; and (2) she has not shown that she was treated less favorably than similarly-situated male, Caucasian, or substantially younger employees.

Ms. Coe claims she witnessed other Extrusion Operators make errors similar to her own but "believes" they were not disciplined. She cannot, however, establish a factual basis for her "belief"; she was not involved in disciplining the other operators. In addition, she cannot establish that the other operators' disciplinary records were as bad as her own---she never saw their personnel files. Ms. Coe's only evidence that other operators were treated more favorably comes from her own speculative deposition testimony. Her own conclusory, uncorroborated assertions that similarly situated co-workers were treated differently are insufficient to thwart summary judgment. *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001). The court finds that Ms. Coe cannot establish that other Extrusion Operators were similarly situated to her but treated more favorably and, therefore, she cannot demonstrate a prima facie case of discrimination.

Furthermore, Ms. Coe cannot establish that she was meeting Cryovac's legitimate performance expectations. The unrefuted evidence is that Ms. Coe's

performance was unsatisfactory and fell short of Cryovac's legitimate expectations. Her supervisors documented her performance errors and disciplined her in accordance with Cryovac's progressive discipline policy---on numerous occasions---throughout her employment as an Extrusion Operator, as the undisputed material facts show. Cryovac suspended Ms. Coe and ultimately terminated her employment after deciding that she had reached the fourth stage of progressive discipline and that her performance had not and would not improve. Ms. Coe's inability to establish that she was meeting Cryovac's legitimate expectations is another reason why she cannot demonstrate a prima facie case of discrimination.

Even if she had offered evidence to establish each element of her prima facie case, Cryovac nevertheless would be entitled to summary judgment. Ms. Coe has no evidence that Cryovac's justifications for her discipline and ultimate discharge---repeated and sustained poor job performance---were pretexts for discrimination. Accordingly, summary judgment will be granted Cryovac on the sex, race, and age discrimination claims.

### B. Discrimination Based on Retaliation.

Ms. Coe asserts a retaliation claim against Cryovac. There is no indication that she has any direct evidence of retaliation, so she must rely on the indirect method to prove her claim. The Seventh Circuit has described the indirect method to prove retaliation as follows:

> [T]he adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that [1] after filing a charge [2] only [she], and not any similarly situated employee who did not file a charge, [3] was subjected to an adverse employment action [4] even though [she] was performing [her] job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for adverse action, [she] is entitled to summary judgment. Otherwise there must be a trial.

*Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant-employer to "articulate some legitimate, non-discriminatory reason" for the employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant's non-discriminatory reason for the conduct is believed by the trier of fact, then it "would support a finding that unlawful discrimination was not the cause of the employment action," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and the defendant is entitled to prevail. If the defendant articulates a non-discriminatory reason, the plaintiff has the opportunity to show that the reason is pretext. *McDonnell Douglas*, 411 U.S. at 804; *Hicks*, 509 U.S. at 507. The given reason does not have to be a good or sympathetic justification for what the employer did to rebut the prima facie case; it only has to be non-discriminatory and true. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 808 (7th Cir. 1999). The ultimate burden remains with the plaintiff to persuade the trier of fact that the defendant-employer intentionally discriminated against her.

Here, the Plaintiff cannot establish retaliation under the indirect method because she cannot show that she was performing her job in a satisfactory manner or that others similarly situated to her were treated differently. Ms. Coe admits she received DARs

12

and performance improvement action plans for performance deficiencies. Although she believes other Extrusion Operators were treated better than she, she has not offered any admissible evidence to raise a genuine issue of material fact as to this matter. Thus, Ms. Coe cannot demonstrate a prima facie case of retaliation. Even if she could prove each element of a prima facie case, however, the undisputed evidence establishes that Cryovac had legitimate business reasons for disciplining, suspending and terminating her, and Ms. Coe offers no inkling of pretext. Therefore, Cryovac is entitled to summary judgment on the retaliation claim.

### C. Intentional Wage Discrimination

Ms. Coe also alleges that she was denied proper wages on account of her sex and race. To establish intentional wage discrimination, she must prove that Cryovac paid her less because of her sex and race. *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1094 (7th Cir. 1999). The court applies the *McDonnell Douglas* framework to the wage discrimination claim. As an element of her prima facie case, Ms. Coe must prove that she was treated (or paid) differently than a similarly situated male or non-African American employee. *See Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1003-04 (7th Cir. 1994). Ms. Coe has not presented any evidence of the specific pay of another Extrusion Operator. She also has not identified any Extrusion Operator who has a performance record as poor as her own. So, she cannot make out a prima facie case.

Even if Ms. Coe could demonstrate a prima facie case of wage discrimination, if Cryovac articulates a legitimate, nondiscriminatory reason for the wage disparity, then it would be entitled to summary judgment, unless Ms. Code showed that reason is a pretext. *Id.* The undisputed evidence shows that Cryovac sets pay rates for its employees, and an employee may be eligible for wage increases at different time periods throughout their employment. However, poor performance may delay an employee's wage rate progression to the next level. The evidence is that Ms. Coe had a record of poor performance and this delayed her wage rate progression. Ms. Coe has not made any effort to show pretext. Therefore, it is appropriate to grant summary judgment for Cryovac on the wage discrimination claims.

### D. Discrimination Based on Harassment

Ms. Coe alleges that her co-workers, supervisors, and managers subjected her to a hostile work environment because of her race, age, and sex. To establish her hostile work environment claim, Ms. Coe must show, *inter alia*, that the conduct about which she complains "was severe or pervasive enough to create a hostile work environment" and that "the conduct was directed at her because of her" sex, race, or age. *See Whittaker v. N. Ill. Univ.*, No. 04-3759, --- F.3d ----, 2005 WL 2291736 (7th Cir. Sept. 21, 2005); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1034 (7th Cir. 2004) ("to establish a *prima facie* case alleging a hostile work environment, [the plaintiff] must first demonstrate that she was harassed, *because of her sex*") (emphasis added). Coe admits that she was never subjected to any harassing behavior while employed at Cryovac and never complained about any racially derogatory comments, sexual

14

comments, or ageist comments. Instead, she claims that her supervisors were being "nitpicky" about her work performance. Unfortunately for her case, Ms. Coe has not offered any evidence to suggest that they were being "nitpicky" because of her race, sex, or age. Therefore, she cannot demonstrate a hostile work environment claim and summary judgment will be granted Cryovac.

## IV. Conclusion

For all of the foregoing reasons, the Defendant's Motion for Summary Judgment (Docket No. 23) will be **GRANTED**. Judgment will be entered separately.

ALL OF WHICH IS ENTERED this 21st day of October 2005.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Cathryn E. Albrecht
Jackson Lewis LLP
albrechc@jacksonlewis.com

Derrick D. Eley
derrickdeley@yahoo.com

Sara A. Weinberg
Jackson Lewis LLP
weinbers@jacksonlewis.com